**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| GARY KWOK-YIN CHAN, | Case No. 6:20-bk-04270-KSJ |
| Debtor. | Judge Karen S. Jennemann |

_____

| | |
|---|---|
| BAOYANG CHEN, | |
| Plaintiff, | Adv. Pro. No. _____ |
| v. | |
| GARY KWOK-YIN CHAN, | |
| Defendant. | |

_____

## COMPLAINT TO DETERMINE
## THE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523

Plaintiff Baoyang Chen ("Plaintiff"), a creditor in the above-captioned case, by his undersigned counsel, respectfully sets forth and alleges for his complaint (the "Complaint") against Defendant Gary Kwok-Yin Chan ("Gary Chan") as follows:

## PARTIES AND JURISDICTION

1.      This Court has jurisdiction over this core proceeding under 28 U.S.C. § 157(b)(2)(1).

2.      This is an action seeking a determination that a certain debt owed by Gary Chan is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B), 11 U.S.C. § 523(a)(4), 11 U.S.C. § 523(a)(6), and Rules 4004 through 4007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      Gary Chan is a citizen of New York.

4.      Plaintiff is a creditor of Gary Chan and is a citizen and resident of the People's

Republic of China.

PROCEDURAL BACKGROUND

5.      On July 30, 2020 ("the Petition Date"), Gary Chan filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code ("Petition") in this Court.

6.      Pending as of the Petition Date was an action filed in the U.S. District Court for the Southern District of Ohio involving Plaintiff and Gary Chan styled *Chan v. GSC Opportunities, L.P., et al.*, Case No. 1:17-cv-460 (the "Ohio Action").

7.      Plaintiff alleges in the Ohio Action that Gary Chan orchestrated with others a criminal and fraudulent scheme designed to defraud Plaintiff and other investors.  Plaintiff alleges that Gary Chan violated the Racketeer Influenced and Corrupt Organizations Act along with federal and Ohio securities laws, committed fraud, breached fiduciary and contractual duties, and converted Plaintiff's funds.  This Adversary Complaint includes many of these allegations.

THE EB-5 INVESTMENT PROGRAM

8.      Plaintiff is a limited partner in GSC Opportunities, L.P. ("GSC"), an Ohio limited partnership organized to allow foreign investors to utilize the EB-5 Visa Program.

9.      In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

10.      Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "Green Cards."

11.      In essence, the EB-5 Program has three key components: (a) immigrant investment

2

of capital; (b) in a new commercial enterprise; that (c) creates jobs.

12.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant investor must invest $500,000.

13.     Gary Chan, in concert with others, used the EB-5 Program to lure Plaintiff into investing $500,000 in GSC, a purported restaurant development project in Ohio, Kentucky, and Indiana.  As will be discussed more fully below, Plaintiff's $500,000 investment has been unlawfully embezzled by Gary Chan and others.

<u>GSC'S STRUCTURE AND PLAINTIFF'S INVESTMENT</u>

14.     In 2013, Gary Chan, Terry Chan (Gary Chan's brother), Jacquelyn Chan (Gary Chan's sister-in-law), and Gold Star Chili, Inc. ("Gold Star"), agreed to develop 12 Gold Star Chili restaurants in Ohio, Kentucky, and Indiana through an EB-5 program.  Gary Chan, Terry Chan, and Gold Star created GSC to carry out this task.

15.     GSC was controlled by Gary Chan, in concert with Terry Chan and Jacquelyn Chan, and Gold Star through GSC OPP Management, LLC ("GSC OPP").  GSC OPP initially had two members, Mason Hill, LLC ("Mason Hill"), an entity controlled by Gary Chan in concert with Terry Chan and Jacquelyn Chan, and GSC EB5 Investor LLC ("GSC EB5"), an entity controlled by Gold Star.

16.     GSC OPP has no separate mind or will of its own, and was controlled by Gary Chan and Terry Chan through Mason Hill, and Gold Star through GSC EB5, for key periods.

17.     GSC OPP, for example, had no independent source of financing, no independent officers, and no independent  assets.  It was entirely reliant on Gary Chan, Terry Chan, Mason Hill, Gold Star, and GSC EB5.

18.     Like GSC OPP, Mason Hill and other entities Gary Chan, Terry Chan, and Jacquelyn Chan controlled had no independent mind or will of their own.   These entities, for example, had no independent assets, property, or officers, shared the same corporate address, and were all part of a massive illicit scheme controlled by Gary Chan in concert with Terry Chan and Jacquelyn Chan.

19.     As is detailed herein, GSC OPP, Mason Hill, and other entities controlled by Gary Chan, Terry Chan, and Jacquelyn Chan were used for wrongful purposes, including to commit fraud, embezzlement, and to launder stolen funds.

20.     In or before 2013, Gary Chan, in concert with Terry Chan, began marketing GSC, or caused GSC to be marketed, to foreign investors eager to use the EB-5 visa process.

21.     In connection with the solicitation of Plaintiff, Gary Chan, in concert with Terry Chan, provided Plaintiff, or caused Plaintiff to be provided, with a promotional booklet for GSC. This promotional booklet detailed the scope of GSC, how it would operate, and how it would be managed.   Gary Chan, in concert with Terry Chan, created, directed, and/or otherwise approved the content in booklet and the statements therein, and was integrally involved in the marketing, distribution, and publication of this booklet to Plaintiff.   A true and accurate copy of the promotional booklet described in this paragraph (both Chinese and English translation versions) is attached hereto as Exhibit A.

22.     This promotional booklet highlighted Gold Star's connection to GSC and provided Plaintiff with detailed descriptions of GSC's purpose and operation to entice his investment. Among other things, the booklet explained that:

- GSC expected to repay investors' principal in three years;

- GSC expected to develop and open 12 Gold Star restaurants within a 300 kilometer, or approximately 186 mile, radius of Cincinnati;

- GSC expected to complete the construction of 12 restaurants within two years;

- Gold Star was the main investor in GSC;

- Gold Star was expected to invest at least $250,000 in each Gold Star restaurant; and,

- GSC expected to open 12 restaurants within "16 months."

23.     This promotional booklet made clear that GSC's explicit purpose was to: (1) open and operate 12 Gold Star restaurants; (2) in conjunction with Gold Star, which was supposed to be integrally involved in GSC; (3) in Cincinnati and/or the surrounding region; and, (4) that this project was supposed to be completed within three years.  However, as is detailed below, this purpose was never accomplished.

24.     Likewise, Gary Chan, in concert with Terry Chan, prepared or helped prepare a business plan explaining the structure, size, and operation of GSC.  A true and correct copy of GSC's business plan is attached hereto as Exhibit B.

25.     This business plan, which was provided to Plaintiff to encourage his investment in GSC, explained:

- GSC would be financed by a $6,000,000 investment from 12 EB-5 investors and a $3,000,000 investment from Gold Star;

- 12 Gold Star restaurants would be developed;

- Each restaurant would be "located within a 200-mile radius of Gold Star Chili's corporate headquarters," which is located in Ohio;

- These restaurants would be located in a number of "target locations," in Ohio, Kentucky, and Indiana;

- Investors would be able to receive a visa to enter the United States in 2014 and would have a permanent Green Card by September 1, 2016; and,

- A complex monthly draw process would be established to ensure that each disbursement of funds was necessary to accomplish GSC's purpose.

26.     Gary Chan, in concert with Terry Chan, also provided, or caused others to provide, interested investors such as Plaintiff with an "Agreement of Limited Partnership" ("Partnership Agreement") that states a number of terms.  A true and correct copy of the Partnership Agreement

provided to Plaintiff is attached hereto as <u>Exhibit C</u>.

27.    The Partnership Agreement explains that GSC is controlled by GSC OPP as a General Partner.  The Partnership Agreement also details GSC's business purpose, and explains:

> The purpose and business of [GSC] shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky, and (ii) own and lease real estate to such franchises[.]

This purpose aligned with the terms of the GSC's business plan, which is attached as an exhibit to the Partnership Agreement.

28.    The Partnership Agreement states that investors such as Plaintiff will be admitted as a limited partner in GSC if they decided to invest.

29.    Importantly, no limited partner has "any right or power to take part in the management or control of the Partnership" under the Partnership Agreement.  Instead, GSC OPP, which was controlled by Gary Chan, Terry Chan, and Jacquelyn Chan during relevant time periods, directed the Partnership as its General Partner.

30.    Gary Chan, in concert with Terry Chan and Jacquelyn Chan and through GSC OPP, had a number of responsibilities under the Partnership Agreement.  The "Management" section of the Partnership Agreement explains that Gary Chan, in concert with Terry Chan and Jacquelyn Chan and through GSC OPP, "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

31.    Gary Chan, in concert with Terry Chan and Jacquelyn Chan and through GSC OPP, must also care for GSC's funds, including limited partners' funds.

32.    Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that Gary Chan, in concert with Terry Chan and Jacquelyn Chan and through GSC OPP, "shall cause the Partnership to conduct its business and operations separate and

apart from that of the General Partner and its affiliates." This includes the responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates."

33.    This provision prohibits Gary Chan and GSC OPP from engaging in self-dealing and bars Gary Chan and GSC OPP from co-mingling GSC's assets with the assets of other companies. This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . to protect the limited liability of the Limited Partners and to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of [the Partnership Agreement] and applicable laws and regulations.

Gary Chan and GSC OPP are accordingly required to take all actions necessary to ensure that GSC remains a valid entity and to accomplish GSC's purpose.

34.    Gary Chan and GSC OPP must also ensure that "[a]ll property in the form of cash not otherwise invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

35.    The Partnership Agreement contains a section covering the dissolution and winding up of GSC if certain events occur ("Liquidating Events"). One of these Liquidating Events is the "happening of any . . . event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."

36.    If a Liquidating Event occurs, the Partnership Agreement explains that GSC will continue to exist "solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners." The Partnership Agreement also

states that no partner, including a general partner, "shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of [GSC's] business and affairs" once a Liquidating Event occurs.

37.    The Partnership Agreement further requires that, once a Liquidating Event occurs, Gary Chan and GSC OPP "shall": (1) take a full account of GSC's liabilities and property; (2) cause the property to be liquidated as promptly as is consistent with obtaining the fair value thereof; and, (3) distribute proceeds to creditors and other Partners.

38.    The Partnership Agreement requires that Gary Chan and GSC OPP provide a notice of the occurrence of a Liquidating Event to a number of parties, including other partners, within 30 days of that event occurring.

39.    The Partnership Agreement binds Gary Chan and GSC OPP to specific performance of the contract, and explains that every partner, including Plaintiff, "would be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

40.    Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule"). This Schedule shows that GSC OPP, as the general partner, will make a $3,000,000 capital contribution to GSC.

41.    This general partner contribution was an essential and material representation to Plaintiff, as it showed that EB-5 investments would not be the only basis of funding for GSC. Further, this contribution reduced Plaintiff's concerns that GSC OPP may breach the contract or abscond with investor funds, as GSC OPP would lose a substantial amount of funds if GSC failed.

42.    This schedule also says that 12 total EB-5 investors will be investing in the project, and that their combined investments will total $6,000,000.

43.    Overall, the Partnership Agreement says that $9,000,000 would be invested in GSC and that Plaintiff's investment would represent 5.556% of all invested funds.

44.     Plaintiff signed a "Counterpart Signature Page and Attestation" included with the Partnership Agreement on or before April 20, 2013, making him an investor in GSC.

<u>THE MATERIALS PROVIDED TO PLAINTIFF WERE FALSE</u>

45.     As Plaintiff would later find out, the promotional booklet, business plan, and Partnership Agreement provided to him were false in significant and material ways. On or before May 7, 2013, Gary Chan and Terry Chan knew that GSC would not be able to comply with a number of material representations contained in these documents.

46.     For example, on May 7, 2013, less than one month after Plaintiff became a GSC investor, Gold Star and Mason Hill executed GSC OPP's Management Agreement ("GSC OPP Operating Agreement").   A true and correct copy of the GSC OPP Operating Agreement is attached hereto as <u>Exhibit D</u>.

47.     Gary Chan and Terry Chan were integrally involved in the preparation of the GSC OPP Operating Agreement, and negotiated with Gold Star officers regarding the terms of this agreement.

48.     The GSC OPP Operating Agreement explained that Gold Star and Mason Hill were working to open and develop 6 Gold Star restaurants in Ohio, Kentucky, and Indiana.

49.     The GSC OPP Operating Agreement also says that 5 EB-5 investors were expected to invest a total of $2,500,000 in GSC, a stark contrast from numerous representations made to Plaintiff that 12 EB-5 investors would invest a total of $6,000,000 in GSC.

50.     Further, the GSC OPP Operating Agreement says that GSC OPP would only invest $1,250,000 in the project, and not $3,000,000 as noted in Plaintiff's promotional booklet, business plan, and Partnership Agreement.

51.     Finally, the GSC OPP Operating Agreement says that GSC would be capitalized with $3,750,000 in total funds, not $9,000,000 as was represented to Plaintiff on numerous

occasions.

52.    In May 2013, GSC EB5 and Mason Hill executed an "Agreement of Limited Partnership of [GSC]," making GSC OPP a Limited Partner in GSC.  This Agreement contains many of the same representations stated in the GSC OPP Operating Agreement.  A true and correct copy of the Agreement of Limited Partnership of GSC OPP is attached hereto as <u>Exhibit E</u>.

53.    Gary Chan was integrally involved in the preparation of the agreement, and negotiated with Gold Star officers regarding the terms of this agreement.

54.    Plaintiff was not informed about these material changes in GSC before he became a GSC investor.  He did not know, among other things, that: (1) GSC would not build the restaurants that it had represented to him on numerous occasions; (2) that GSC would be undercapitalized with a fraction of the EB-5 investors represented to him; and, (3) that the entire project had only $3,750,000 in financing and not $9,000,000 as materially represented.

55.    Plaintiff did not even know that GSC OPP was not a member of GSC at the time he became a GSC investor.  GSC OPP did not execute a GSC partnership agreement until after Plaintiff became a GSC investor.

56.    The materials provided to and executed by Plaintiff therefore contained numerous misrepresentations fraudulently designed by Gary Chan and others acting in concert with him to entice Plaintiff's investment.

<u>GOLD STAR WITHDRAWS FROM GSC</u>

57.    Tensions between Gold Star, Gary Chan, and Terry Chan arose due to USCIS issues.  Gary Chan, Terry Chan, and Mason Hill failed to timely ensure that GSC's business plan was approved by USCIS, and that USCIS approved GSC EB-5 investors.

58.    This delay was problematic because EB-5 investor funds could not be released from escrow and used in the project without I-526 petition approval.  Gold Star therefore complained

that it lacked the financing needed to open and operate additional restaurants.

59.    On August 31, 2015, Gold Star, through GSC EB5, sent Mason Hill and Gary Chan a "Notice of Termination of Partnership EB5" via email or U.S. mail.  A true and correct copy of this August 31, 2015 notice is attached hereto as Exhibit F.

60.    GSC EB5 explained in this notice that it could not open and operate additional Gold Star Chili restaurants because it could not access the GSC investors' funds.  The delay caused by the lack of I-526 petition and business plan approval "made it practically impossible for [GSC EB5] to secure adequate locations for . . . additional Gold Star Chili franchise locations."  Gold Star attempted to terminate GSC OPP on August 31, 2015 as a result.

61.    GSC EB5's notice was addressed to a number of GSC limited partners, including Plaintiff.  This notice, however, was sent to each limited partner in the "care of" Mason Hill, which is controlled by Gary Chan in concert with Terry Chan and Jacquelyn Chan.  Mason Hill and Gary Chan never provided the notice to Plaintiff.  As such, GSC EB5's notice was illusory.

62.    Despite the fact that it was "practically impossible" to perform the fundamental purpose of GSC, which is a Liquidating Event under the Partnership Agreement, GSC was not dissolved.

63.    On October 8, 2015, counsel for Mason Hill, Gary Chan, and Terry Chan informed Gold Star's counsel that Gold Star could not unilaterally dissolve GSC or GSC OPP.

64.    Gold Star, Mason Hill, Gary Chan, and Terry Chan thereafter began negotiating Gold Star's withdrawal from GSC and GSC OPP.   This was a lengthy process, and Gold Star did not withdraw from GSC OPP and GSC until, at the earliest, November 14, 2016.

65.    Gold Star did not want any GSC investors to be admitted as limited partners, or any GSC investor funds removed from escrow accounts, until Gold Star withdrew from GSC OPP and

GSC.  Gold Star communicated this fact to Gary Chan, Terry Chan, and Mason Hill on or before August 3, 2016.

66.     Gary Chan, Terry Chan, and Mason Hill twice recognized this understanding.  On August 3, 2016, counsel, on behalf of Gary Chan, Terry Chan, and Mason Hill, wrote to Gold Star's counsel that "Terry and Gary [Chan] are assuming that Gold Star would like to withdraw from [GSC and GSC OPP] prior to the admission of the Limited Partners . . . and the disbursement of funds from the escrow agent."  This attorney reiterated this understanding in an email sent to Gold Star's counsel on August 11, 2016.   Gary Chan, Terry Chan, and Mason Hill made these representations knowing they were false.

67.     On August 8, 2016, Gary Chan and Terry Chan caused GSC's funds, including Plaintiff's funds, to be released from escrow accounts at U.S. Bank, National Association and transferred to a GSC account at First Financial Bank ("First Financial").

68.     Gary Chan was authorized to access these escrow accounts and to transfer funds in those accounts.

69.     Between August 10, 2016 and at least December 2016, Gary Chan, Terry Chan, and Jacquelyn Chan stole Plaintiff's funds and used these funds for purposes that they were never intended and which Plaintiff never consented to.

70.     Gary Chan in concert with Terry Chan laundered these funds through a number of bank accounts owned by entities they controlled to disguise the source of these funds.  These funds were then used by Gary Chan, Terry Chan, and Jacquelyn Chan to, among other things, enrich themselves, finance unrelated businesses, and pay personal and/or businesses debts. Gary Chan, Terry Chan, and Jacquelyn Chan converted Plaintiff's funds for their own personal gain and for purposes completely unrelated to GSC.

71.     Gary Chan in concert with Terry Chan laundered Plaintiff's funds primarily through two different processes. The first process involved routing Plaintiff's funds through a number of bank accounts that belonged to various entities controlled by Gary Chan, Terry Chan, and Jacquelyn Chan that allegedly "managed" other "subsidiary" entities. These bank accounts belonged to Mason Hill, Clearwater Hospitality Group, LLC ("Clearwater"), and Jardin Hill, LLC ("Jardin Hill") (collectively, the "Management Entities"). Gary Chan in concert with Terry Chan routed Plaintiff's funds through Management Entity bank accounts and then distributed these funds to themselves, affiliated businesses, or third parties to make it appear as if these funds were being legitimately paid by the Management Entities.

72.     Gary Chan, Terry Chan, and Jacquelyn Chan controlled the Management Entities and used these entities to commit fraud. These Management Entities merely acted as extensions of the these individuals themselves, and were used to conceal the theft of Plaintiff's funds.

73.     For example, $244,976 of Plaintiff's funds were transferred from GSC's bank account to an account belonging to Jardin Hill on August 10, 2016. From there, $12,800 of Plaintiff's funds were transferred from the Jardin Hill account via a check written to "CASH (Terry Chan)." Terry Chan then deposited this check into a personal bank account.

74.     Furthermore, on August 11, 2016, $200,000 of Plaintiff's funds were transferred from a Jardin bank account to a bank account belonging to Clearwater. On August 12, 2016, $21,000 of Plaintiff's funds were transferred from this Clearwater bank account to another Clearwater bank account. That same day, $8,768 of Plaintiff's funds were transferred to Jacquelyn Chan by check.

75.     This story consistently repeats itself, as bank account records show that Plaintiff's funds were directly routed to Gary Chan, Terry Chan, and Jacquelyn Chan to pay for things entirely unrelated to GSC's purpose.

76.     Gary Chan, Terry Chan, and Jacquelyn Chan used Plaintiff's funds to purchase clothes, finance gambling expenses, and for other personal expenditures.  These transfers were not authorized under the Partnership Agreement or other applicable contract, and were made despite Gold Star's explicit instruction that no GSC limited partners' funds be used until Gold Star withdrew from GSC and GSC OPP.

77.     $67,248 of Plaintiff's funds were also used by Gary Chan, Terry Chan, and Jacquelyn Chan to pay various Clearwater payroll, tax, and 401k contributions from Clearwater bank accounts.  Most, if not all, of these funds were used to benefit Gary Chan, Terry Chan, and Jacquelyn Chan personally or unrelated entities they controlled.

78.     The second process used by Gary Chan, Terry Chan, and Jacquelyn Chan to launder Plaintiff's and other GSC EB-5 investors' funds was related to Rodizio Grill restaurants they owned, operated, and/or controlled.  Gary Chan in concert with Terry Chan routed Plaintiff's funds first through bank accounts belonging to the Management Entities.  These funds were then generally routed to a bank account belonging to Lumen Point Capital Fund I, LLC ("LPCF"), another entity controlled by Gary Chan, Terry Chan, and Jacquelyn Chan.  From there, Plaintiff's funds were routed to bank accounts belonging to RG MGMT, LLC ("RG MGMT") and RG Opportunities I, L.P. ("RG OPP") (collectively, "Rodizio Entities"), two other entities owned and controlled by Gary Chan, Terry Chan, and Jacquelyn Chan.

79.     Gary Chan, Terry Chan, and Jacquelyn Chan paid Rodizio Grill expenses, employee salaries, and other costs from Rodizio Entity accounts to make it appear as if these funds were legitimately derived from Rodizio Grill business activities or investments.  For example: (1) approximately $50,133 of Plaintiff's funds were used to pay the franchisor of Rodizio Grill restaurants; (2) approximately $32,130 of Plaintiff's funds were paid to Padre Grill, LLC for Rodizio Grill operating costs; (3) approximately $46,623 of Plaintiff's funds were used to finance

an equipment purchase for Rodizio Grill restaurants; (4) approximately $62,477 of Plaintiff's funds were used to pay various payroll, tax, and 401k expenses for Rodizio Grill employees; and, (5) almost $11,000 of Plaintiff's funds were used to pay Ohio sales taxes incurred by Rodizio Grill restaurants.

80.     All of the transfers of investor funds to and from Rodizio Grill-affiliated accounts were completely unrelated to GSC's purpose and therefore unlawful. They also violated provisions in the Partnership Agreement that prohibited the co-mingling of funds.

81.     Overall, banking records demonstrate that Gary Chan, Terry Chan, and Jacquelyn Chan have used these two money laundering processes to: (1) enrich themselves in excess of hundreds of thousands of dollars; (2) pay gambling expenses; (3) finance a number of personal vacations; (4) pay legal fees related to another EB-5 investor lawsuit; (5) pay personal credit cards; and, (6) pay the business expenses of a number of unaffiliated businesses.    Banking records demonstrate that Gary Chan used GSC as his own personal pocketbook.

GSC CHANGES ITS FOCUS AND PLAINTIFF ATTEMPTS TO WITHDRAW FROM GSC

82.     On March 10, 2016, Plaintiff, through his immigration counsel, Pan-Pacific Immigration Law Group ("Pan-Pacific"), sent an email to Gary Chan asking for an audited financial report and an update regarding GSC.  Pan-Pacific explained that they wished to receive a project update and assurances that Plaintiff's investment was safe.  Pan-Pacific also asked that Gary Chan respond by March 17, 2016.

83.     The March 17, 2016, deadline passed with no response from Gary Chan, so Pan-Pacific followed up with another email on March 29, 2016.

84.     Terry Chan replied to Pan-Pacific's March 29, 2016 email later that same day and said that he would respond to Pan-Pacific's requests by the end of the week and that GSC investors' funds were "in escrow for the GSC project."

85.     Eventually, Gary Chan and Terry Chan's counsel responded to Plaintiff's inquiries. In a letter dated April 13, 2016, more than one month after Plaintiff's initial email, counsel explained that investor funds were still in an escrow account.  The reason for this was because Gold Star purportedly had "decided to no longer participate in the Partnership and the proposed activities" of GSC.  The letter further noted:

> [Gold Star] was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development.  It decided, subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement.  The decision to withdraw from the Partnership has left the Partnership, with Mason Hill, LLC, as the only active member, with limited choices.

This letter did not explain when Gold Star had made these decisions, nor if GSC would seek to hold Gold Star liable for its breach of the Partnership Agreement.  A true and correct copy of the April 13, 2016, letter is attached hereto as Exhibit G.

86.     Gold Star had opened multiple restaurants for GSC prior to this letter being sent. Gold Star accordingly did, in fact, develop and follow-up on its commitments, and Gary Chan and Terry Chan's misrepresentation to the contrary was false.

87.     Gold Star's decision to abandon the project was a Liquidating Event under the Partnership Agreement, as it was an "event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."   GSC should have been liquidated when Gold Star decided to leave GSC in 2015, and Plaintiff's funds should have been returned to him.

88.     Instead of immediately liquidating the Partnership, this April 13, 2016 letter said that GSC OPP believed that two options remained on the table.  The first option was to "terminate the Partnership" and return funds to the investors.  The second option was to "utilize the funds in the Partnership to invest in restaurants other than Gold Star franchises pursuant to a business plan similar to another project involving entities affiliated with" the Gary Chan, Terry Chan, and

Jacquelyn Chan.  The reality was that only one option existed – terminate the partnership and return Plaintiff's funds.

89.     The business plan discussed in this letter appeared to involve the construction and operation of Buffalo Wings & Rings ("BWR") restaurants in the Pittsburgh, Pennsylvania area. Attached to this letter was a Private Placement Memorandum ("PPM") for Buffalo Wings & Rings Pittsburgh Opportunities, L.P. ("Pittsburgh Project").  This PPM stated that Gary Chan, Terry Chan, and Jacquelyn Chan were managing a project to fund and operate five BWR restaurants in Pennsylvania.  However, this was false.

90.     On July 27, 2016, approximately three months later, Pan-Pacific received another letter from GSC's counsel, who was directed to send this letter by Gary Chan and Terry Chan. The letter explained that there were "imminent time sensitive time opportunities to build" at least one BWR restaurant.  The letter did not provide any details about the location of this restaurant, whether the restaurant would comply with GSC's stated purpose, or the costs associated with building this restaurant in this letter.

91.     This letter, ignoring the terms of the Partnership Agreement, explained that funds generated from the investments of limited partners in GSC (which amounted to $1,500,000 at that time), such as Plaintiff, would be the primary source of capital for the project.  The general partner would make *zero* contributions to the BWR project unless the limited partners' funds were "not sufficient to successfully complete and open" a BWR restaurant.  Only then would the general partner provide funds.

92.     The letter disguised the fact that the general partner would have zero financial liability if the project were to fail, and that GSC investor funds were the only source of capital for this purported project.  Gold Star's purported withdrawal from GSC therefore not only barred the very purpose of GSC from being completed, but also eliminated the single largest source of

funding from GSC. Gary Chan and Terry Chan intentionally failed to disclose to Plaintiff about the ramification of Gold Star's withdrawal from GSC and about the consequences of this reduced capital to the success of the project.

93.     No prospectus, discussion of prospective investment, PPM, or details regarding the proposed BWR project was provided to Plaintiff with this July 27, 2016 letter or at any other time. Gary Chan gave Plaintiff a deadline of August 10, 2016, to withdraw from the Partnership or his funds would be involuntarily invested into the vague BWR project.

94.     This letter required such an quick "decision" because Gary Chan, Terry Chan, and Jacquelyn Chan had run into significant financial problems and needed immediate access Plaintiff's funds to keep themselves, and unrelated businesses, afloat. They needed to steal Plaintiff's funds.

95.     On July 25, 2016, two days before Pan-Pacific received the letter detailed above, Clearwater's Chief Operating Officer and Director of Finance sent a letter to Jacquelyn Chan, Terry Chan, and Gary Chan, and requested a meeting to discuss the state of the business.

96.     In this letter, addressed to Clearwater's "principals," these corporate officers "expressed concerns about recent cash management activities initiated outside of [their] knowledge and control." Specifically, these officers learned that Clearwater and other Management Entities had: (1) withheld hourly employee pay and tips because of insufficient funds (therefore possibly violating Federal law); (2) withheld manager pay; (3) had defaulted on a number of other payments because of insufficient funds in Clearwater, RG OPP, and Jardin Hill bank accounts; (4) had not made employee 401k contributions; (5) had not paid medical deductions; (6) and were defaulting on vendor payments because of insufficient funds.

97.     Because of these financial issues, which impacted the very bank accounts Gary Chan in concert with Terry Chan would eventually direct Plaintiff's funds through, the Clearwater

officers wanted to have a meeting with Jacquelyn Chan, Terry Chan, and Gary Chan that same day.

98.    This meeting, however, likely never took place, as Gary Chan, Terry Chan, and Jacquelyn Chan decided to immediately fire both of these officers.  Jacquelyn Chan executed separation agreements involving both officers in or after August 2016.

99.    On August 11, 2016, Pan-Pacific received an email from Gary Chan and Terry Chan's counsel advising that GSC was moving forward with developing BWR locations, and that it would begin to release investor funds from escrow.  However, Plaintiff's funds were released from escrow on August 8, 2016 (prior to the purported deadline), and Gary Chan, Terry Chan, and Jacquelyn Chan started converting Plaintiff's funds on August 10, 2016.

100.    On September 2, 2016, Plaintiff was informed, for the first time, that the BWR project was different than what was represented in the earlier letters.  Gary Chan and Terry Chan informed Plaintiff that they were planning on constructing and operating two potential BWR projects in Orlando, Florida; not in the Pittsburgh area as previously represented to Plaintiff.

101.    Gary Chan and Terry Chan further represented that the limited partners' funds, totaling $1,500,000, "remain[ed] in the partnership."  This statement was false, as Gary Chan, Terry Chan, and Jacquelyn Chan had already began converting Plaintiff's funds before September 2, 2016.

102.    Plaintiff was not provided with a PPM, subscription agreement, or other type of document discussing the proposed investment in the Orlando restaurant.  Additionally, Gary Chan and Terry Chan failed to provide any assurances that investing into a single BWR franchise in Orlando, Florida would meet EB-5 program regulations.

103.    Accordingly, Gary Chan and Terry Chan, without obtaining Plaintiff's consent, transformed GSC from a partnership focused on building multiple Gold Star restaurants in

Kentucky, Ohio, and Indiana to a partnership focused on building one BWR location in Orlando, Florida. This transformation fundamentally breached the Partnership Agreement and duties Gary Chan owed to Plaintiff.

104.    Plaintiff has repeatedly attempted to withdraw from GSC and have his funds returned. Gary Chan and Terry Chan never allowed Plaintiff to withdraw and have not returned his funds despite numerous demands.

105.    Gary Chan attempted to conceal his criminal acts and fired corporate officers who were poised to expose his fraud. This shows that Gary Chan knowingly and intentionally committed the actions detailed herein with the intent of harming Plaintiff.

<u>COUNT I - THE DEBT OWED TO PLAINTIFF IS NOT DISCHARGEABLE UNDER<br>11 U.S.C. § 523(a)(2)(A)</u>

106.    Plaintiff incorporates by reference and realleges paragraphs 1 through 105 of this Complaint as is fully set forth herein.

107.    Pursuant to 11 U.S.C. § 523(a)(2)(A), a discharge under section 727 does not discharge an individual debtor from any debt for money or property to the extent it was obtained by false pretenses, a false representation, or actual fraud.

108.    Gary Chan owed Plaintiff a duty to provide Plaintiff with accurate information regarding GSC, including its financial condition and assets.

109.    Gary Chan knew that materials provided to Plaintiff before he invested in GSC materially misrepresented GSC's anticipated and actual assets, liabilities, and financial condition. Gary Chan also knew that subsequent communications and materials sent to Plaintiff contained material misrepresentations about GSC's operations and finances.

110.    For example, Gary Chan knew that the promotional booklet, Business Plan, and Partnership Agreement provided to Plaintiff misrepresented that GSC would be financed with a

combined $9,000,000, that there would be 12 foreign investors, that GSC would develop 12 restaurants, and that GSC OPP would contribute $3,000,000 to GSC.

111.    Through Gary Chan's direct involvement in negotiations related to the GSC OPP Operating Agreement and the May 2013 partnership agreement, Gary Chan knew that GSC would never be financed with $9,000,000, that it would never have 12 foreign investors, that it would not develop 12 restaurants, and that GSC OPP would not contribute $3,000,000 to GSC.    The materials provided to Plaintiff were accordingly false and intentionally misleading, and were designed to entice his investment.

112.    Similarly, Gary Chan caused a letter dated April 13, 2016 to be mailed to Plaintiff that fraudulently misrepresented that Gold Star decided, "subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement."

113.    As is detailed above, Gold Star did, in fact, open and operate multiple Gold Star restaurants for GSC before this letter was sent.

114.    Gary Chan also caused a July 27, 2016 letter to be sent to Plaintiff which fraudulently misrepresented GSC's financial conditions and the purpose behind releasing GSC's funds.  This letter represented that there were "imminent time sensitive opportunities at the table to build two [BWR] locations," and provided an illusory August 10, 2016, deadline for Plaintiff for to withdraw from GSC.

115.    This "imminent" opportunity was a lie.  Gary Chan, Terry Chan, and Jacquelyn Chan, and businesses they controlled, had run into significant financial problems and Gary Chan needed Plaintiff's funds to keep the fraudulent scheme afloat.  In fact, two days before this letter was sent, Clearwater officers notified Gary Chan, Terry Chan, and Jacquelyn Chan that the officers had identified numerous financial problems with Clearwater, Jardin Hill, and the Rodizio Entities.

116.    Gary Chan also caused his attorney to misrepresent to Pan-Pacific on August 11, 2016, that Plaintiff's funds would be released from escrow. Gary Chan had, in fact, released these funds from escrow on August 8, 2011, three days before this communication was sent and two days before Plaintiff's illusory "deadline" to withdraw from GSC.

117.    Gary Chan also misrepresented GSC's financial condition on September 2, 2016, when he represented to Plaintiff that Plaintiff's funds "remain[ed] in the partnership." Gary Chan, however, had started converting Plaintiff's funds well before this representation was made.

118.    Gary Chan intentionally represented that these materials, and others as are detailed above, were accurate or knowingly allowed them to be represented as accurate, when in fact he knew these materials were false.

119.    The false and inaccurate omissions, statements, and representations made by Gary Chan were material to Plaintiff's decision to invest and remain invested in GSC.

120.    Though his involvement in preparing these materials themselves or in causing these materials to be prepared, because of his active participation in the theft of Plaintiff's funds, and as an owner and/or officer of GSC, GSC OPP, Clearwater, Jardin Hill, the Rodizio Entities, and other entities, Gary Chan knew that the information contained in each of these materials provided to Plaintiff was false.

121.    Gary Chan provided these materials to Plaintiff to deceive him into remaining invested in GSC and to cover up their theft of Plaintiff's funds.

122.    Gary Chan intended for Plaintiff to rely on the truth of these statements when deciding whether to invest or stay invested in GSC. Had Plaintiff withdrawn from GSC before August 8, 2016, when Gary Chan released Plaintiff's funds from escrow, Gary Chan could not finance his lavish lifestyle or keep unrelated businesses afloat.

123. Gary Chan induced Plaintiff to reasonably rely, and Plaintiff did reasonably rely, on the truth of the statements and representations made by Gary Chan. Had Plaintiff received truthful information, he would not have invested in GSC or remained invested in GSC.

124. When Gary Chan made these statements and representations, he knew the statements and representations were not true and complete, or he acted with such reckless disregard to the truth and completeness of the statements that knowledge may be inferred.

125. Gary Chan's conduct described above constitutes fraud as set forth in 11 U.S.C. § 523(a)(2)(A).

126. As a result of Gary Chan's conduct, Plaintiff has been damaged in excess of $500,000, attorneys' fees and costs in excess of $100,000, and punitive damages in an amount to be determined at trial.

127. The damages suffered by Plaintiff as a consequence of Gary Chan's misconduct are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

<u>COUNT II - THE DEBT OWED TO PLAINTIFF IS NOT DISCHARGEABLE UNDER<br>11 U.S.C. § 523(a)(2)(B)</u>

128. Plaintiff incorporates by reference and realleges paragraphs 1 through 105 of this Complaint as is fully set forth herein.

129. Pursuant to 11 U.S.C. § 523(a)(2)(B), a discharge under section 727 does not discharge an individual debtor from any debt for money or property to the extent it was obtained by use of a statement in writing (1) that is materially false; (2) respecting the debtor or an insider's financial condition; (3) on which the creditor reasonably relied; and, (4) that the debtor caused to be made or published with intent to deceive.

130. Gary Chan owed Plaintiff a duty to provide Plaintiff with accurate information regarding GSC, including its financial condition and assets.

131.   Gary Chan knew that materials provided to Plaintiff before he invested in GSC materially misrepresented GSC's anticipated and actual assets, liabilities, and financial condition. Gary Chan also knew that subsequent communications and materials sent to Plaintiff contained material misrepresentations about GSC's operations and finances.

132.   For example, Gary Chan knew that the promotional booklet, Business Plan, and Partnership Agreement provided to Plaintiff misrepresented that GSC would be financed with a combined $9,000,000, that there would be 12 foreign investors, that GSC would develop 12 restaurants, and that GSC OPP would contribute $3,000,000 to GSC.

133.   Gary Chan knew that GSC would never be financed with $9,000,000, that it would never have 12 foreign investors, that it would not develop 12 restaurants, and that GSC OPP would not contribute $3,000,000 to GSC.   The materials provided to Plaintiff were accordingly false and intentionally misleading, and were designed to entice his investment.

134.   Similarly, Gary Chan caused a letter dated April 13, 2016 to be mailed to Plaintiff that fraudulently misrepresented that Gold Star decided, "subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement."

135.   As is detailed above, Gold Star did, in fact, open and operate multiple Gold Star restaurants for GSC before this letter was sent.

136.   Gary Chan also caused a July 27, 2016 letter to be sent to Plaintiff which fraudulently misrepresented GSC's financial conditions and the purpose behind releasing GSC's funds.  This letter represented that there were "imminent time sensitive opportunities at the table to build two [BWR] locations," and provided an illusory August 10, 2016, deadline for Plaintiff to withdraw from GSC.

137.     This "imminent" opportunity was a lie.  Gary Chan and his businesses had run into significant financial problems and Gary Chan needed Plaintiff's funds to keep the fraudulent scheme afloat.  In fact, two days before this letter was sent, Clearwater officers notified Gary Chan, Terry Chan, and Jacquelyn Chan that they had identified numerous financial problems with Clearwater, Jardin Hill, and the Rodizio Entities.

138.     Gary Chan also caused his attorney to misrepresent to Pan-Pacific on August 11, 2016, that Plaintiff's funds would be released from escrow.  Gary Chan had, in fact, released these funds from escrow on August 8, 2011, three days before this communication was sent and two days before Plaintiff's illusory "deadline" to withdraw from GSC.

139.     Gary Chan also misrepresented GSC's financial condition on September 2, 2016, when he represented to Plaintiff that Plaintiff's funds "remain[ed] in the partnership."  Gary Chan and others, however, had started converting Plaintiff's funds well before this representation was made.

140.     Gary Chan intentionally represented that these materials, and others as are detailed above, were accurate or knowingly allowed them to be represented as accurate, when in fact he knew these materials were false.

141.     The false and inaccurate omissions, statements, and representations made by the Gary Chan were material to Plaintiff's decision to invest and remain invested in GSC.

142.     Though his involvement in preparing these materials themselves or in causing these materials to be prepared, because of his active participation in the theft of Plaintiff's funds, and as an owner and/or officer of GSC, GSC OPP, Clearwater, Jardin Hill, the Rodizio Entities, and other entities, Gary Chan knew that the information contained in each of these materials provided to Plaintiff was false.

143.    Gary Chan provided these materials to Plaintiff to deceive him into remaining invested in GSC and to cover up their theft of Plaintiff's funds.

144.    Gary Chan intended for Plaintiff to rely on the truth of these statements when deciding whether to invest or stay invested in GSC. Had Plaintiff withdrawn from GSC before August 8, 2016, when Gary Chan released Plaintiff's funds from escrow, Gary Chan could not finance his lavish lifestyle or keep unrelated businesses afloat.

145.    Gary Chan induced Plaintiff to reasonably rely, and Plaintiff did reasonably rely, on the truth of the statements and representations made by Gary Chan.  Had Plaintiff received truthful information, he would not have invested in GSC or remained invested in GSC.

146.    When Gary Chan made these statements and representations, he knew the statements and representations were not true and complete, or they acted with such reckless disregard to the truth and completeness of the statements that knowledge may be inferred.

147.    Gary Chan's conduct described above constitutes fraud as set forth in 11 U.S.C. § 523(a)(2)(B).

148.    As a result of Gary Chan's conduct, Plaintiff has been damaged in excess of $500,000, attorneys' fees and costs in excess of $100,000, and punitive damages in an amount to be determined at trial.

149.    The damages suffered by Plaintiff as a consequence of the Gary Chan's misconduct are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

## COUNT III - THE DEBT OWED TO PLAINTIFF IS NOT DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(4)

150.    Plaintiff incorporates by reference and realleges paragraphs 1 through 105 of this Complaint as is fully set forth herein.

151.    Pursuant to 11 U.S.C. § 523(a)(4), a discharge under section 727 does not discharge an individual debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

152.    As is detailed above, Gary Chan operated, directed, and controlled GSC OPP, GSC's general partner.  This operation, direction, and control was so pervasive that GSC OPP has no independent mind or will of its own.

153.    Under Ohio law, general partners owe a fiduciary duty to limited partners.  *Arpadi v. First Msp Corp.*, 68 Ohio St. 3d 453, 458 (Ohio 1994). Gary Chan, through his control of GSC OPP and direct involvement in the unlawful actions, therefore owed Plaintiff a fiduciary duty.

154.    Gary Chan breached fiduciary duties owed to Plaintiff by, among other things, willfully violating the Partnership Agreement, committing fraud, embezzling Plaintiff's funds, and operating a fraudulent scheme designed to steal Plaintiff's entire GSC investment.

155.    Plaintiff entrusted his investment funds to Gary Chan.  These funds were placed in an escrow account and were to be removed only to further the purpose of GSC, and to assist Plaintiff in obtaining his Green Card.

156.    Instead of using Plaintiff's funds for these purposes, however, Gary Chan embezzled Plaintiff's funds and committed larceny using a network of affiliated companies and bank accounts.

157.    As is demonstrated above, Gary Chan in concert with others stole all of Plaintiff's funds from GSC between August and December, 2016.  Gary Chan used Plaintiff's funds to finance his lavish lifestyle and pay for the operation of Rodizio Grill restaurants.

158.    Gary Chan also owed Plaintiff a duty to provide Plaintiff with accurate information regarding GSC, including its financial condition and assets.

159.   Gary Chan knew that materials provided to Plaintiff before he invested in GSC materially misrepresented GSC's anticipated and actual assets, liabilities, and financial condition. Gary Chan also knew that subsequent communications and materials sent to Plaintiff contained material misrepresentations about GSC's operations and finances.

160.   For example, Gary Chan knew that the promotional booklet, Business Plan, and Partnership Agreement provided to Plaintiff misrepresented that GSC would be financed with a combined $9,000,000, that there would be 12 foreign investors, that GSC would develop 12 restaurants, and that GSC OPP would contribute $3,000,000 to GSC.

161.   Through Gary Chan's direct involvement in negotiations related to the GSC OPP Operating Agreement and the May 2013 partnership agreement, Gary Chan knew that GSC would never be financed with $9,000,000, that it would never have 12 foreign investors, that it would not develop 12 restaurants, and that GSC OPP would not contribute $3,000,000 to GSC.   The materials provided to Plaintiff were accordingly false and intentionally misleading, and were designed to entice his investment.

162.   Similarly, Gary Chan caused a letter dated April 13, 2016 to be mailed to Plaintiff that fraudulently misrepresented that Gold Star decided, "subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement."

163.   As is detailed above, Gold Star did, in fact, open and operate multiple Gold Star restaurants for GSC before this letter was sent.

164.   Gary Chan also caused a July 27, 2016 letter to be sent to Plaintiff which fraudulently misrepresented GSC's financial conditions and the purpose behind releasing GSC's funds.  This letter represented that there were "imminent time sensitive opportunities at the table to

build two [BWR] locations," and provided an illusory August 10, 2016, deadline for Plaintiff for to withdraw from GSC.

165.    This "imminent" opportunity was a lie.  Gary Chan and his businesses had run into significant financial problems and Gary Chan needed Plaintiff's funds to keep the fraudulent scheme afloat.  In fact, two days before this letter was sent, Clearwater officers notified Gary Chan, Terry Chan, and Jacquelyn Chan that they had identified numerous financial problems with Clearwater, Jardin Hill, and the Rodizio Entities.

166.    Gary Chan also caused his attorney to misrepresent to Pan-Pacific on August 11, 2016, that Plaintiff's funds would be released from escrow.  Gary Chan had, in fact, released these funds from escrow on August 8, 2011, three days before this communication was sent and two days before Plaintiff's illusory "deadline" to withdraw from GSC.

167.    Gary Chan also misrepresented GSC's financial condition on September 2, 2016, when he represented to Plaintiff that Plaintiff's funds "remain[ed] in the partnership."  Gary Chan, however, had started converting Plaintiff's funds well before this representation was made.

168.    Gary Chan intentionally represented that these materials, and others as are detailed above, were accurate or knowingly allowed them to be represented as accurate, when in fact they knew these materials were false.

169.    The false and inaccurate omissions, statements, and representations made by the Gary Chan were material to Plaintiff's decision to invest and remain invested in GSC.

170.    Though his involvement in preparing these materials himself or in causing these materials to be prepared, because of his active participation in the theft of Plaintiff's funds, and as an owner and/or officer of GSC, GSC OPP, Clearwater, Jardin Hill, the Rodizio Entities, and other entities, Gary Chan knew that the information contained in each of these materials provided to Plaintiff was false.

171.    Gary Chan provided these materials to Plaintiff to deceive him into remaining invested in GSC and to cover up his theft of Plaintiff's funds.

172.    Gary Chan intended for Plaintiff to rely on the truth of these statements when deciding whether to invest or stay invested in GSC. Had Plaintiff withdrawn from GSC before August 8, 2016, when Gary Chan released Plaintiff's funds from escrow, Gary Chan could not finance hid lavish lifestyle or keep unrelated businesses afloat.

173.    Gary Chan induced Plaintiff to reasonably rely, and Plaintiff did reasonably rely, on the truth of the statements and representations made by Gary Chan.  Had Plaintiff received truthful information, he would not have invested in GSC or remained invested in GSC.

174.    When Gary Chan made these statements and representations, he knew the statements and representations were not true and complete, or they acted with such reckless disregard to the truth and completeness of the statements that knowledge may be inferred.

175.    As a result of Gary Chan's false, fraudulent, willful and malicious misconduct, breaches of fiduciary duty, defalcation, embezzlement, and larceny, Plaintiff has been damaged in excess of $500,000, attorneys' fees and costs in excess of $100,000, and punitive damages in an amount to be determined at trial.

176.    The damages suffered by Plaintiff as a consequence of Gary Chan's misconduct are non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

<u>COUNT IV - THE DEBT OWED TO PLAINTIFF IS NOT DISCHARGEABLE UNDER<br>11 U.S.C. § 523(a)(6)</u>

177.    Plaintiff incorporates by reference and realleges paragraphs 1 through 105 of this Complaint as is fully set forth herein.

178.    Pursuant to 11 U.S.C. § 523(a)(6), a discharge under section 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

179.    As is detailed above, Gary Chan repeatedly, intentionally, and maliciously injured Plaintiff, GSC, and GSC OPP by failing to care for Plaintiff's funds, embezzling from Plaintiff and GSC, committing fraud, and otherwise operating a fraudulent scheme designed to plunder GSC's and Plaintiff's funds.   Gary Chan committed these acts with an actual intent to harm Plaintiff.

180.    Gary Chan committed the acts detailed herein with an actual intent to harm Plaintiff, and lied to Plaintiff on numerous occasions to prevent Plaintiff from learning of the Chan's illegal conduct.

181.    As a result of Gary Chan's conduct, Plaintiff has been damaged in excess of $500,000, attorneys' fees and costs in excess of $100,000, and punitive damages in an amount to be determined at trial.

182.    The damages suffered by Plaintiff as a consequence of Gary Chan's misconduct are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

<u>COUNT V – FEDERAL SECURITIES LAW VIOLATIONS</u>

183.    Plaintiff restates the paragraphs 1 through 105 as if fully rewritten.

184.    Gary Chan violated federal securities laws in connection with the actions discussed herein.

185.    15 U.S.C. § 78j(b), as well as Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibits any person from making any untrue statement of material fact, or from omitting certain material facts, in connection with the purchase or sale of any security.

186.    As is explained above, Gary Chan provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a Business Plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC.  Gary Chan used means or instrumentalities of interstate commerce, or the mails, to make these statements and/or omissions to Plaintiff.

187.    For example, Gary Chan misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants GSC would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.  Each of these false statements was knowingly made with the intent to deceive, manipulate, or defraud.

188.    This is demonstrated by, among other things, the fact that on or about three weeks after Plaintiff executed his Partnership Agreement, Gary Chan prepared or helped prepare materials showing that: (1) less than 12 Gold Star restaurants were going to be constructed; (2) only 5, and not 12, limited partners would invest in GSC; (3) GSC would have only $3,750,000 in capital and not $9,000,000; and, (4) Gold Star would only invest $1,250,000 in GSC, and not $3,000,000.

189.    Plaintiff justifiably relied on false statements and/or omissions when deciding to invest in GSC.  These were material representations about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

190.    Plaintiff is a purchaser of securities and Gary Chan was a seller of securities.  Gary Chan not only held title of the security before it passed to Plaintiff, but also played a substantial role in persuading Plaintiff to buy the security.

191.    Gary Chan's misrepresentations proximately caused Plaintiff's injuries and loss because Plaintiff would not have invested in GSC but for these misrepresentations.

192.    Gary Chan's material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, Business Plan, and promotional booklet.

193.    As a direct and proximate result of Gary Chan's conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

<u>COUNT VI – FRAUD</u>

194.    Plaintiff restates the paragraphs 1 through 105 as if fully rewritten.

195.    Gary Chan provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a Business Plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC.

196.    For example, Gary Chan misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants Gold Star would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.

197.    Each of these false statements was made with knowledge, or which such disregard and recklessness as to whether they were true or false that knowledge may be inferred.

198.    These statements were made with the intent of misleading Plaintiff to rely on these statements.

199.    Plaintiff justifiably relied on these false statements and/or omissions when deciding to invest in GSC.  These were material representations or omissions about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

200.    Gary Chan's misrepresentations proximately caused Plaintiff's injuries and loss because Plaintiff would not have invested in GSC but for these misrepresentations.

201.    These material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, Business Plan, and promotional booklet.

202.    Furthermore, Gary Chan provided Plaintiff with materials littered with false statements after he invested in GSC.

203.    For example, Gary Chan in concert with Terry Chan caused the mailing of a number of letters to Plaintiff in 2016 regarding Gold Star's withdrawal from GSC, as is discussed

above. These letters, among other things, falsely stated the circumstances of Gold Star's withdrawal from GSC, and that GSC had no assets or property.

204. These letters also omitted key and necessary information regarding, among other things, the circumstances of Gold Star's withdrawal from GSC and GSC OPP.

205. These misrepresentations and omissions caused Plaintiff to remain invested in GSC, which ultimately led to his funds being embezzled by Gary Chan, Terry Chan, and Jacquelyn Chan.

206. As a direct and proximate result of Gary Chan's fraud, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

<u>COUNT VII – BREACH OF CONTRACT</u>

207. Plaintiff restate the paragraphs 1 through 105 as if fully rewritten.

208. GSC OPP, which is now controlled by Mason Hill, Gary Chan, Terry Chan, and Jacquelyn Chan, entered into the Partnership Agreement with Plaintiff in 2013.

209. The Partnership Agreement explicitly states that the purpose of GSC is to open and operate Gold Star restaurants in Ohio, Kentucky, and Indiana.

210. The Partnership Agreement also explains that if it is ever "impossible or impractical to carry on the business of the Partnership," that GSC would be quickly liquidated by GSC OPP.

211. If GSC OPP ever determined that a Liquidating Event occurred, it had to provide all partners with a notice of occurrence of a Liquidating Event within 30 days.

212. In addition, the Partnership Agreement says that, should a Limited Partner's I-526 petition be denied, GSC OPP would return that Partners' capital contribution in 90 days.

213. The Partnership Agreement further notes, in a section titled "Duties and Obligations of General Partner," that GSC OPP "shall cause the Partnership to conduct its business and

operations separate and apart from that of the General Partner and affiliates." This includes GSC OPP's responsibility to "segregat[e] Partnership assets" and to ensure the "funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates."

214.   GSC OPP further had an obligation to care for Plaintiff's funds, and could only maintain Partnership funds "not otherwise invested" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or in escrow accounts.

215.   As detailed in the foregoing paragraphs, Gary Chan failed to conduct himself in the best interests of the Partnership. In doing so, Gary Chan breached the Partnership Agreement by, among other things: (1) failing to ensure that GSC only invested in projects that conformed to the purposes listed in the Partnership Agreement; (2) failing to wind up and dissolve GSC upon the occurrence of a Liquidating Event; (3) failing to provide Plaintiff and other Limited Partners with a notice of occurrence of a Liquidating Event when that event occurred; (4) failing to return Plaintiff's capital contribution upon the occurrence of a Liquidating Event; (5) failing to ensure GSC conducted its business and operations separate and apart from GSC OPP or its affiliates; (6) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (7) engaging in self-dealing; (8) failing to care for Plaintiff's funds and allowing these funds to be converted; and, (9) failing to maintain Plaintiff's funds in accounts belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts.

216.   Gary Chan not only committed contractual breaches through his own acts and omissions, but also through acts and omissions committed by and through GSC OPP and the Management Entities, entities that Gary Chan, in concert with Terry Chan and Jacquelyn Chan, dominated and controlled, and which Gary Chan used to commit fraud and other illegal acts.

217.    As a direct and proximate result of these defendants' numerous breaches of contract, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

COUNT VIII – BREACH OF FIDUCIARY DUTY

218.    Plaintiff restates paragraphs 1 through 105 of the Complaint as if fully rewritten.

219.    Gary Chan owes Plaintiff a statutory, contractual, and common law duty of the utmost good faith and loyalty in the handling of GSC and his investment funds.

220.    This fiduciary relationship is confirmed by the Partnership Agreement, which granted the General Partner "the sole and exclusive right and responsibility to manage the business" of GSC.  Limited Partners, such as Plaintiff, did not "have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way."  Plaintiff therefore relied on GSC OPP, the General Partner, and those that controlled GSC OPP to act for his benefit and protect the Partnership.

221.    Given the fundamental nature of this Partnership and specific references to immigration processes in the Partnership Agreement, Gary Chan was under a duty to use his best efforts to run GSC in a manner that would result in the creation of jobs and secure Plaintiff's EB-5 visa.  Gary Chan has breached this duty to Plaintiff and his actions caused Plaintiff to withdraw his EB-5 visa application.

222.    For example, Gary Chan breached his fiduciary duty to Plaintiff by, among other things, converting GSC Limited Partner funds, failing to ensure that GSC carried out the purposes defined in the Partnership Agreement, failing to provide Plaintiff with accurate information about GSC, failing to correct misrepresentations made to GSC Limited Partners, failing to protect Plaintiff's or GSC's funds, failing to ensure that GSC OPP satisfied its duties as GSC's General

Partner, causing GSC OPP to breach the GSC OPP Operating Agreement and GSC's Agreement of Limited Partnership, and failing to liquidate GSC upon the occurrence of a liquidating event.

223.   Gary Chan not only committed contractual breaches through his own acts and omissions, but also through acts and omissions committed by and through GSC OPP and the Management Entities, entities that Gary Chan, in concert with Terry Chan and Jacquelyn Chan, dominated and controlled, and which Gary Chan used to commit fraud and other illegal acts.

224.   As a direct and proximate result of Gary Chan's numerous breaches of his fiduciary duties to Plaintiff, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## COUNT IX – GROSS NEGLIGENCE

225.   Plaintiff restates Paragraphs 1 through 105 of the Complaint as if fully rewritten.

226.   Gary Chan owed Plaintiff a duty of care to properly manage GSC and his investment funds consistent with the Partnership and Escrow Agreements, EB-5 rules and regulations, and the representations made to Plaintiff as described above.

227.   This standard of care of a general partner in a limited partnership is detailed in R.C. § 1782.241(A), which says that a general partner "shall perform the duties of a general partner in good faith, in a manner the general partner reasonably believes to be in or not opposed to the best interests of the limited partnership, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

228.   Gary Chan violated this standard of care to Plaintiff by, among other things: (1) engaging in self-dealing transactions; (2) failing to ensure GSC conducted its business and operations separate and apart from GSC OPP or its affiliates; (3) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of GSC; (5) failing to maintain Plaintiff's funds in accounts

belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts; (6) failing to liquidate GSC once it became clear it was impossible or impractical to carry on the business of GSC; (7) failing to provide Limited Partners with a notice of the occurrence of a Liquidating Event; (8) failing to return Plaintiff's capital contribution upon the occurrence of a Liquidating Event; (9) failing to care for Plaintiff's funds; (10) failing to provide Plaintiff with a PPM or other information related to the Orlando project before Plaintiff's funds were invested into this project; and, (11) failing to obtain Plaintiff's, or other Limited Partners', affirmative consent to fundamentally change the nature, purpose, and scope of GSC.

229.   Gary Chan not only committed contractual breaches through his own acts and omissions, but also through acts and omissions committed by and through GSC OPP and the Management Entities, entities that Gary Chan, in concert with Terry Chan and Jacquelyn Chan, dominated and controlled, and which Gary Chan used to commit fraud and other illegal acts.

230.   As a direct and proximate result of Gary Chan's gross negligence, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## COUNT X - CONVERSION

231.   Plaintiff restate Paragraphs 1 through 105 of the Complaint as if fully rewritten.

232.   Gary Chan has, without authorization, knowingly asserted dominion and control over Plaintiff's specific and identifiable property, the investment funds, that are owned and/or properly payable to Plaintiff.  Gary Chan's conversion is inconsistent with Plaintiff's rights and ownership of said property.

233.   Plaintiff has repeatedly made demands for the return of his property.  Plaintiff's funds, however, have not been returned.

234.    As a direct and proximate result of Gary Chan's conversion of Plaintiff's funds, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## COUNT XI – BREACH OF R.C. § 1782.242 AND RESCISSION OF THE GSC INVESTMENT

235.    Plaintiff restates paragraphs 1 through 105 of the Complaint as if fully rewritten.

236.    Partners in a partnership are generally prohibited from engaging in self-dealing transactions without the approval of other partners.

237.    Under Ohio law, "[n]o contract, action, or transaction shall be void or voidable with respect to a limited partnership" because of self-dealing if one of three exceptions applies.  R.C. § 1782.242.   These exceptions apply when: (1) the material facts of the transaction are disclosed in writing to every partner before the partner is admitted in the partnership; (2) the material facts of the transaction are disclosed in writing to all partners, the transaction is fair to the limited partnership, and a majority of disinterested partners authorize the transaction; or, (3) the transaction is fair, and is authorized and approved by a majority of the disinterested limited partners.  R.C. § 1782.242(A)-(C).

238.    As is detailed above, Gary Chan has engaged in a pattern of self-dealing to the detriment of Plaintiff.   Gary Chan has either directed all of Plaintiff's investments to entities unaffiliated with GSC, to himself, or to those he acts in concert with, has controlled entities that permitted these transfers, or has failed to stop the embezzlement of Plaintiff's funds.

239.    Gary Chan not only committed contractual breaches through his own acts and omissions, but also through acts and omissions committed by and through GSC OPP and the Management Entities, entities that Gary Chan, in concert with Terry Chan and Jacquelyn Chan, dominated and controlled, and which Gary Chan used to commit fraud and other illegal acts.

240.    These acts of self-dealing are prohibited because: (1) these transactions were not disclosed to Plaintiff; (2) the material facts of the transactions were never disclosed in writing to all partners, nor approved by a disinterested general partner; and, (3) these transactions were never approved by a majority of disinterested limited partners.

241.    As a direct and proximate result of these Gary Chan's pattern of self-dealing, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.  Plaintiff also seeks to rescind the investment that GSC made in any entities affiliated with these defendants.

## COUNT XII – UNJUST ENRICHMENT/QUANTUM MERUIT

242.    Plaintiff restates Paragraphs 1 through 105 of the Complaint as if fully rewritten.

243.    Plaintiff conferred a substantial benefit on Gary Chan by investing $500,000 with GSC.

244.    Gary Chan has misappropriated and wasted Plaintiff's investment funds as alleged above.

245.    Under the circumstances, it would be unjust to Plaintiff to allow Gary Chan to retain the benefits conferred upon him by Plaintiff.

246.    Plaintiff has been damaged in excess of $500,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

## COUNT XIII – OHIO SECURITIES LAW VIOLATIONS

247.    Plaintiff restates Paragraphs 1 through 105 of the Complaint as if fully rewritten.

248.    Ohio law has many requirements that govern the sale of securities.   See R.C. 1707.01, et seq.

249.     Among other things, Ohio law requires that "the sale of securities representing an interest in a partnership … [or] limited partnership …." may be carried out only upon compliance with certain registration requirements.  R.C. § 1707.06(3).

250.     Upon information and belief, Gary Chan did not ensure that the sale of GSC limited partner interests were properly registered with Ohio Division of Securities.  See R.C. § 1707.08.

251.     As is discussed herein, Plaintiff also received a promotional booklet, Business Plan, and Partnership Agreement from Gary Chan, or from individuals directed by Gary Chan to send these materials to Plaintiff, touting the structure, organization, and purpose of GSC.  As is also discussed herein, many of the statements contained in these materials were false, as GSC did not resemble what was discussed in these materials.

252.     Gary Chan not only committed contractual breaches through his own acts and omissions, but also through acts and omissions committed by and through GSC OPP and the Management Entities, entities that Gary Chan, in concert with Terry Chan and Jacquelyn Chan, dominated and controlled, and which Gary Chan used to commit fraud and other illegal acts.

253.     Under R.C. § 1707.41(A), Gary Chan is liable for the "loss or damage" sustained by Plaintiff, who relied on these materials, the false material statements contained therein, and Gary Chan's omission of materials facts, to invest in GSC.

254.     Further, under R.C. § 1707.43(A), "every sale or contract for sale made in violation of Chapter 1707 of the Revised Code is voidable at the election of the purchaser."  Each person that participated in or aided the seller of these securities is jointly and severally liable to Plaintiff "for the full amount paid by [Plaintiff] and for all taxable court costs."

255.     As a direct and proximate result of Gary Chan's conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

a.   Determining that the compensatory and punitive damages caused by Gary Chan's misconduct be held non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § (a)(2)(B); 11 U.S.C. § 523(a)(4); and 11 U.S.C. § 523(a)(6);

b.   Awarding compensatory damages against Gary Chan in an amount in excess of $500,000, the exact amount to be proven at trial, and statutory damages;

c.   Awarding forfeiture of any fees paid to Gary Chan in excess of $45,000;

d.   Punitive damages in an amount not less than three times compensatory damages, the exact amount to be determined at trial;

e.   Piercing GSC, GSC OPP, Mason Hill, Jardin Hill, and/or Clearwater's corporate veil to the extent necessary to provide complete relief; and,

f.   Such other relief as the Court deems just and equitable, including pre-judgment and post-judgment interest, costs, and attorney's fees.

Respectfully submitted,

*/s/ Christopher D. Cathey*
Christopher D. Cathey (0663255)
Porter, Wright, Morris & Arthur LLP
250 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone:      (513) 369-4214
Facsimile:       (513) 421-0991
E-mail:           ccathey@porterwright.com

*Attorney for Plaintiff Baoyang Chen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2020, I electronically filed the foregoing with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to all attorneys of record. I also caused the following to be mailed via regular U.S. mail to:

Gary Kwok-Yin Chan
360 W. 34th St., Apt. 9N
New York, NY 10001

Justin M. Luna
Latham, Luna, Eden & Beaudine, LLP
P.O. Box 3353
Orlando, FL 32802-3353

*Counsel for Gary Chan*

/s/ *Christopher D. Cathey*
Christopher D. Cathey